24 So.3d 879 (2009)
Jessica SEVIN
v.
Robert Levis CHEVROLET and Risk Management Services, LLC.
No. 2008 CA 1362.
Court of Appeal of Louisiana, First Circuit.
April 30, 2009.
*881 Delbert G. Talley, Covington, LA, for Plaintiff/Appellant, Jessica Sevin.
Robert D. Hoover, Baton Rouge, LA, for Defendants/Appellees, Robert Levis Chevrolet, Inc. and Risk Management Services, LLC.
Before KUHN, GUIDRY, and GAIDRY, JJ.
GUIDRY, J.
A former employee appeals a decision of the Office of Workers' Compensation Administration denying her claim for benefits. For the following reasons, we render in part and affirm.

FACTS AND PROCEDURAL HISTORY
On October 9, 2006, Jessica Sevin, claimant, was hired to work as a cashier for Robert Levis Chevrolet, Inc. (Levis Chevrolet) in its accounting office. On November 1, 2006, Ms. Sevin was injured when she fell from her desk chair as it rolled backwards while she was leaning forward to use a calculator on her desk. On May 25, 2007, Ms. Sevin filed a disputed claim for compensation challenging Levis Chevrolet's failure to pay indemnity benefits and failure to authorize certain medical treatment. The disputed claim for compensation was filed against Levis Chevrolet and Risk Management Services, LLC, Levis Chevrolet's workers' compensation insurer (hereinafter referred to collectively as "Levis Chevrolet").
Levis Chevrolet answered Ms. Sevin's disputed claim for compensation, asserting that it was not liable for payment of workers' compensation benefits to Ms. Sevin because medical compensation was provided and a job was made available to Ms. Sevin within the restrictions outlined by her primary treating physicians. Levis Chevrolet further averred that Ms. Sevin voluntarily chose not to return to the job provided. Levis Chevrolet later amended its answer to allege that Ms. Sevin had forfeited any claim for benefits based on her violation of La. R.S. 23:1208.
This matter proceeded to trial before a workers' compensation judge (WCJ). Following a trial on the merits, the WCJ rendered judgment in favor of Levis Chevrolet, dismissing Ms. Sevin's claim for indemnity benefits and dismissing her claim for mental injury with prejudice. The WCJ further dismissed Levis Chevrolet's defense based on La. R.S. 23:1208 and 1208.1, and decreed that Levis Chevrolet "is obligated to Jessica Sevin for any future medical treatment directly related to her physical injury sustained November 1, 200[6] provided same is reasonable and necessary and pre-approved by Robert Levis Chevrolet, Inc." Ms. Sevin appeals from the written judgment dated March *882 14, 2008, incorporating the aforementioned decrees.

ASSIGNMENTS OF ERROR
Ms. Sevin alleges that the WCJ erred in making the following determinations:
1. The WCJ erred in finding that the employer offered work within the restrictions set by the claimant's physicians.
2. The WCJ erred in finding that petitioner did not meet her burden of proof with regard to the physicalmental injury because she had preexisting conditions.
3. The WCJ erred in not holding that the claimant's employer failed to properly investigate her claim.

DISCUSSION
In her first assignment of error, Ms. Sevin asserts that the WCJ erroneously found that she could return to work within the first week after she sustained her workplace injury, and therefore she was not entitled to indemnity benefits.[1] She contends that additional medical evidence presented at trial established that she was restricted from returning to work until November 15, 2006, and even then the authorization to return to work restricted her activities in several respects, with the most critical restrictions being that of no bending or stooping.
In order to recover workers' compensation benefits, a claimant must suffer a personal injury by accident arising out of and in the course of employment. La. R.S. 23:1031(A). There is no dispute that Ms. Sevin suffered a work-related injury. Nevertheless, in order to recover indemnity benefits, an employee in a workers' compensation action has the further burden of establishing a causal link between the accident and the subsequent disabling condition. To obtain an award of indemnity benefits, a claimant must prove by clear and convincing evidence, unaided by any presumption of disability, that she is physically unable to engage in any employment or self employment. La. R.S. 23:1221(1). A workers' compensation claimant has the burden of proving her claim, even though the Louisiana Workers' Compensation Act is to be construed liberally in favor of the claimant. Romero v. Western Sizzlin, Inc., 94-2302, p. 5 (La.App. 1st Cir.6/23/95), 658 So.2d 11, 13, writ denied, 95-2296 (La.11/27/95), 663 So.2d 741.
The testimony and evidence presented at trial reveals that on the day following Ms. Sevin's workplace accident on November 1, 2006, she called her supervisor complaining of back pain. Ms. Sevin was instructed to go to Pelican Urgent Care for examination and treatment. Ms. Sevin visited Pelican Urgent Care on November 2, 6, and 13, 2006. Following the first visit, a work status report was faxed to Levis Chevrolet stating that Ms. Sevin could return to work on November 4, 2006, subject to certain restrictions. The work status report also stated that Ms. Sevin had been prescribed medications that could cause drowsiness and that she should return to the clinic for a follow up visit in four days.
Although Ms. Sevin was authorized to return to work on November 4, 2006, Kelly Weathers, the office manager for Levis Chevrolet, testified that November 4, 2006, was a Saturday, and as such, the company did not expect Ms. Sevin to return to work *883 until Monday, November 6, 2006. On November 6, 2006, Ms. Sevin did not return to work, but returned to Pelican Urgent Care with complaints that the medication prescribed was not relieving her pain. The medications prescribed to Ms. Sevin were changed and a second work status report, dated November 6, 2006, was faxed to Levis Chevrolet authorizing Ms. Sevin to return to work on November 7, 2006, with the same restrictions previously mandated. The November 6, 2006 work status report also stated that Ms. Sevin had been prescribed medications that could cause drowsiness and that she should return for a follow up visit in one week. Notably, Ms. Sevin was not restricted from driving by either the November 2 or November 6 work status reports.
Ms. Sevin's last visit to Pelican Urgent Care occurred on November 13, 2006, one week after her prior visit. The work status report for that visit indicated that her diagnosis had changed from lower back pain[2] to lumbar strain. Moreover, Ms. Sevin was restricted from returning to work for two days and was due to return for a follow-up visit on November 15, 2006. Also included on that work status report was the following handwritten notation: "pt. request history form not be faxed to employer."
An employee log contained in Ms. Sevin's personnel file with Levis Chevrolet contains a statement that on November 10, 2006, Ms. Sevin called to say that she was seeking treatment from a chiropractor. Ms. Sevin testified that she informed Ms. Weathers she was unable to return to work because of the medications she was prescribed and therefore she would seek treatment from a chiropractor in an effort to alleviate her pain without use of the pain medications prescribed for her.
Ms. Sevin's medical records from Slidell Chiropractic Clinic were placed into evidence at trial. The records include a single-page form describing the examination and treatment of Ms. Sevin at the clinic following the November 1, 2006 accident. Outlined at the top of the form is a plan for Ms. Sevin to receive daily treatment at the clinic for two weeks. It is further noted that Ms. Sevin was excused from work for the two weeks of treatment. According to progress notes listed on the form, Ms. Sevin only completed two visits, on November 10 and 13, 2006. Thereafter, the next entry on the form is dated January 2, 2007, in which it is noted that a phone consultation with workers' compensation occurred on that date, at which time it was explained that the patient did not return for follow up care due to severe pain.
Kathy Bates, the Risk Management Services adjuster who processed Ms. Sevin's claim, also testified at trial. Ms. Bates stated that she was never contacted to authorize any mental health or medical treatment for Ms. Sevin other than the treatment provided at Pelican Urgent Care and Slidell Chiropractic Clinic. She denied receiving a letter from Ms. Sevin dated May 14, 2007, requesting approval to seek additional medical treatment. Ms. Sevin acknowledged at trial that she sent the May 14, 2007 letter by certified mail, but never received confirmation of delivery.
Ms. Bates explained that Ms. Sevin was not paid indemnity benefits, despite documentation from Ms. Sevin's chiropractor excusing her from work until November 24, 2006 (two weeks from her *884 first chiropractic visit on November 10, 2006), because Ms. Sevin's medical doctor at Pelican Urgent Care had released her to return to work. Ms. Bates did not deny receiving the report from Ms. Sevin's chiropractor excusing her from work for two weeks.[3]
At the time of trial, Ms. Sevin was being treated by Dr. Michael Rowland, a pain management doctor, who began treating her in April 2007, for chronic neck[4] and back pain. Dr. Rowland's certified medical records were introduced into evidence.[5] On a "New Patient Medical History" questionnaire, Ms. Sevin stated that the incident that originally started her pain symptoms was a motor vehicle accident that occurred in October 2003. Although following his initial exam, Dr. Rowland noted physical limitations for Ms. Sevin of no heavy lifting and no prolonged sitting, standing, bending, walking or lying supine, Dr. Rowland neither indicated that Ms. Sevin was restricted from working nor did he diagnose her as being disabled according to his medical records.
Ms. Weathers and Kristy LeBlanc, Ms. Sevin's direct supervisor, also testified at trial. Both women stated that they told Ms. Sevin she could return to her previous position with the company and that accommodations would be made to ensure that she could perform her job duties within the restrictions outlined by Pelican Urgent Care. Ms. Leblanc testified that one of Ms. Sevin's job duties was to provide the key to the file cabinet where the keys for vehicles on sale were kept in the bottom drawer. She stated that Ms. Sevin simply had to take the file cabinet key from a rack on the wall and hand the key to any salesperson needing to retrieve a vehicle key from the file cabinet. Ms. Leblanc said that she saw no reason why Ms. Sevin would need to bend or stoop to perform her job duties, but should an activity arise requiring Ms. Sevin to do so, Ms. Leblanc stated that others, including Ms. Leblanc, were available to perform the task for Ms. Sevin.
In deciding whether a claimant in a workers' compensation action has proven the disability claimed, the totality of the evidence, medical and lay, must be considered. Bethley v. Keller Construction, 01-1085, p. 9 (La.App. 1st Cir.12/20/02), 836 So.2d 397, 404, writ denied, 03-0228 (La.4/21/03), 841 So.2d 792. To justify an award of indemnity benefits, a claimant must prove by clear and convincing evidence, unaided by any presumption of disability, that he is physically unable to engage in any employment or self-employment. La. R.S. 23:1221. Factual findings regarding whether a workers' compensation claimant has met her burden of proving disability and the length thereof must be given great weight and will not be *885 overturned on appeal absent manifest error. Atwell v. First General Services, 06-0392, p. 5 (La.App. 1st Cir.12/28/06), 951 So.2d 348, 352, writ denied, 07-0126 (La.3/16/07), 952 So.2d 699. Under that standard of review, an appellate court may only reverse WCJ's factual determinations if it finds from the record that a reasonable factual basis for the finding does not exist, or that examination of the entire record reveals that the finding is clearly erroneous. Nichols v. Sanderson Farms, 05-2356, p. 3 (La.App. 1st Cir.11/3/06), 950 So.2d 789, 791. Moreover, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact will not be disturbed upon review. Atwell, 06-0392 at 5, 951 So.2d at 352.
Based on the totality of the evidence presented, we cannot say that the WCJ erred in finding that Ms. Sevin failed to prove, by clear and convincing evidence, that she was disabled as a result of the November 1, 2006 accident, and thus, entitled to indemnity benefits. While Ms. Sevin testified that she was unable to work, her testimony was contradicted, in part, by the medical evidence presented and the testimony of her supervisors. And while Ms. Sevin's chiropractor, William Chapel, did restrict Ms. Sevin from returning to work for two weeks after her initial visit at the chiropractic clinic, it was reasonable for the WCJ to discredit this evidence in light of the fact that Ms. Sevin failed to appear for follow up appointments with either the chiropractor or with Pelican Urgent Care. We therefore reject Ms. Sevin's first assignment of error.
In her second assignment of error, Ms. Sevin contends that the WCJ erred in finding that she did not prove by clear and convincing evidence that she was disabled due to a mental injury caused by her physical injury. The mental injury allegedly sustained is depression.
Where a mental injury or illness develops secondary to a physical injury sustained in a work-related accident, a claimant is entitled to workers' compensation benefits for any disability resulting from the mental injury or illness and to reimbursement for medical expenses for treatment of the mental injury. Charles v. South Central Industries, 96-0883, p. 5 (La.11/25/96), 683 So.2d 706, 708. In order to obtain compensation benefits for a mental injury caused by a physical injury: (1) the claimant must prove by clear and convincing evidence that the physical injury caused the mental injury, (2) the mental injury must be diagnosed by a licensed psychiatrist or psychologist, and (3) the diagnosis must meet the most current criteria established by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. La. R.S. 23:1021(8)(c) and (d). To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Ross v. Remediation Services of Louisiana, 97-2102, p. 5 (La.App. 1st Cir.5/15/98), 714 So.2d 218, 221.
A claimant who is unable to return to work as a result of a mental injury is entitled to temporary total disability benefits. Atwell, 06-0392 at 4, 951 So.2d at 352. Benefits for a temporary total disability shall be awarded only if a claimant proves by clear and convincing evidence that she is physically unable to engage in any employment. La. R.S. 23:1221(l)(c). A claimant who suffers from a pre-existing medical condition is also entitled to benefits if the accident aggravated, accelerated or combined with the pre-existing condition to produce disability. Atwell, 06-0392 at 4, 951 So.2d at *886 352. An employer takes the worker as he finds him. An abnormally susceptible worker is entitled to no less protection under the compensation statute than a healthy worker. Stelly v. Guy Scroggins, Inc., 96-401, pp. 7-8 (La.App. 3d Cir.10/9/96), 682 So.2d 782, 786, writ denied, 96-3060 (La.2/7/97), 688 So.2d 503.
At trial, Ms. Sevin was questioned regarding her pre-existing mental and physical condition. Although Ms. Sevin claimed that she was not under active mental health treatment at the time she went to work for Levis Chevrolet, she did admit to a history of depression and suicidal ideation and attempts. Her first suicide attempt occurred in 1999, when Ms. Sevin was 21 years old. At that time Ms. Sevin attempted suicide by overmedicating on prescription drugs.
The deposition testimony of Dr. Raymond Baez, a family practice doctor and Ms. Sevin's primary care physician, was introduced at trial. Dr. Baez testified that Ms. Sevin had already been diagnosed as suffering from mental illness at the time she first came under his care, but in the course of his treatment, his examination of Ms. Sevin confirmed the diagnosis of depression. As a result, Dr. Baez continued to prescribe the anti-depression medication, Wellbutrin, for treatment of Ms. Sevin's condition. A few months before the November 1, 2006 workplace accident, Dr. Baez increased Ms. Sevin's dosage of Wellbutrin following a July 31, 2006 visit. During that visit, Dr. Baez noted that Ms. Sevin "[c]ontinues to have pain, lumbrosacral, since she had an injury in 2003" and that "[s]he has problems with depression and family history of bipolar." Dr. Baez authorized a refill of the medication Wellbutrin on August 24, 2006, and September 26, 2006.
Following Ms. Sevin's workplace accident on November 1, 2006, she became increasingly depressed and ultimately made two consecutive suicide attempts by drug overdose in January 2007. The first attempt occurred on January 3, 2007, when she overmedicated on the medications Soma and Xanax. When it was realized that Ms. Sevin had attempted suicide, she was rushed to Northshore Regional Medical Center, and after being resuscitated, she was transferred to the psychiatric unit of St. Charles Hospital. According to the assessment record, upon her admission to St. Charles Hospital, Ms. Sevin's chief complaint was "I just couldn't take it anymore." In the history provided to the hospital, Ms. Sevin disclosed that her husband[6] had assaulted her in the past and more recently had begun grabbing her by the neck and choking her. As a result, it was noted in her history that:
She feels completely overwhelmed by being trapped in this relationship, feels unwilling and fearful of leaving him. They have severe financial difficulties and are facing losing their house and their cars. She said part of her wanted to die and part of her just wanted to go to sleep when she took the medications.
Ms. Sevin's diagnosis was listed as major depressive disorder. Ms. Sevin was discharged from St. Charles Hospital on January 9, 2007.
On January 11, 2007, Ms. Sevin again attempted to commit suicide, this time by taking over 100 pills of Tylenol and Flexeril. She was again transported to Northshore Regional Medical Center, and later transferred to the Lurline Smith Mental Health Center, where she received psychiatric treatment from Dr. Juan E. Labadie, a psychiatrist, and Regina Puryear, a licensed *887 clinical social worker. During her hospitalization at Lurline, the following history was recorded by Dr. Labadie:
The patient reported [an] intentional overdose requiring hospitalization at Ochsner Hospital 10 years ago. She had two psychiatric outpatient clinic visits after that hospitalization, but due to problems with her deductible, she followed for about 14 years with Dr. Baez, also primary care. She reports about 6 intentional ingestions in total, the above 3[7] with documented medical intervention. She also reports a teenage history of superficial self lacerations/self mutilative behavior and reports being here briefly at age 13 or 14.
Dr. Labadie diagnosed Ms. Sevin with major depression and borderline personality disorder.
Ms. Puryear, whose deposition testimony was presented at trial, began treating Ms. Sevin on an outpatient basis following her hospitalization at Lurline Smith. Ms. Puryear stated that the stressors contributing to Ms. Sevin's depression were Ms. Sevin having no income and her consequential inability to make payments for her house, car, and utilities. When asked what would be the best type of job for Ms. Sevin considering her stressors, Ms. Puryear stated that Ms. Sevin could probably work in a job that did not require her to deal with the public very much, but she was unsure of Ms. Sevin's physical limitations in regard to employability and could only relate the information provided to her by Ms. Sevin regarding her physical complaints and limitations. When further asked her opinion about whether Ms. Sevin was capable of holding a job, Ms. Puryear replied:
I don't think so, because  even if she didn't have the physical problem, the stressors that she has had  of course, that's partly due to not being able to work.
But I don't think that  with all that's going on in her personal life, that it would be  it would really be difficult for her to hold a job.
Nevertheless, Ms. Puryear stated that she referred Ms. Sevin to Louisiana Rehabilitation Service because "if you have a mental health diagnosis, they will help you get new training or education for a job." Ms. Puryear acknowledged that Ms. Sevin had a long history of depression and treatment for depression long before the November 1, 2006 accident.
Based on this evidence, we cannot say that the WCJ was clearly wrong in finding that Ms. Sevin did not meet her burden of proving that she sustained a mental injury caused by physical injury or even exacerbation of her pre-existing mental condition. Instead, the evidence indicates that the escalation of Ms. Sevin's depression is more properly linked to her family and financial problems. Moreover, we observe that the evidence presented was insufficient to show that Ms. Sevin is disabled as a result of her depression. Consequently, we find no error in the WCJ's ruling holding that Ms. Sevin is not entitled to indemnity benefits as a result of a mental injury. See also Our Lady of the Lake Regional Medical Center v. Matthews, 06-1584, pp. 11-12 (La.App. 1st Cir.9/26/07), 971 So.2d 354, 361-363.
In her final assignment of error, Ms. Sevin contends that the WCJ erred in not finding that Levis Chevrolet failed to properly investigate her claim. We find merit in this assignment of error.
Compensation benefits for an injured employee may not be discontinued on the basis of inconclusive medical reports; *888 it is incumbent upon the insurer to make reasonable efforts to ascertain the employee's exact medical condition at the time benefits are terminated. Salvador v. Slidell Industries, Inc., 415 So.2d 511 (La. App. 1st Cir.1982). However, when an insurer's termination of compensation is based upon competent medical evidence, the action is not arbitrary and capricious. Prejean v. RPM Pizza, 93-635 (La.App. 3d Cir.2/2/94), 631 So.2d 1359, 1361-1362, writ denied, 94-0715 (La.4/29/94), 637 So.2d 468.
According to Ms. Sevin's workers' compensation claim file, the following remarks were recorded in a "Database and Remarks Tracking System":
11/20/06 CLOA
Ray Cedor called to say he cannot get a response from pi. atty Greg Unger on taking the clmt statement. I have also not yet recv'd the Choice of Physician Form or the HIPPA [sic] or the Certification form. I'll ask the clmt atty to send these right away. If not, it may be necessary to stop all benefits, let it go into a 1008 so we can secure the past medical records we need, (kb)
...
11/28/06 CLMDD
MEDICAL DIARY STOP MED IF SIGNED FORMS NOT RETURNED
12/01/06 CLMDD
MEDICAL DIARY STOP MED IF SIGNED FORMS NOT RETURNED
12/05/06 CLMD
I called the office of Dr. Chapel to find out if the clmt has kept her appts. I was told that after we approved 2 weeks of chiro treatment on 11/9 the clmt came in on 11/10 and 11/13/06. They have not seen her since. They will call her to see if they can determine what is happening. I will not approve any more treatment based on the fact the clmt has not returned the State required forms and that she has obviously not needed to return for treatment, (kb)
12/27/06 CLMDD
MEDICAL DIARY CLOSE IF NOTHING MORE HEARD AND CLMT HAS NOT RET FOR TXMNT
...
1/17/07 CLZC
The clmt called to say she terminated her atty and made a demand that she be paid TTD from the date of acc. I explained that the medical doctor had released her to light duty which was within her job requirements. She stated that with the medication she was taking she did not feel it was wise to report for work. I explained that the determination of disability is not up to me or her, but decided upon by a medical physician. She then stated that she has had two attempts at suicide and feels it is related to our accident. The last one she says placed her in ICU for several days. I explained to the clmt that we have paid all monies we feel we owe on the claim and she abandoned the medical treatment she chose through her chiropractor. She indicated she would [be] seeking other legal counsel, (kb)
...
5/14/07 CLZC
The clmt called about getting more medical treatment. She said her health coverage ran out. She has had new MRI's, one of her neck & one of her back, and has been seeing *889 a pain management doctor. She would like us to begin picking up payment of the medical treatment again. I explained that she had abandoned medical treatment last year. She denied this. She stated that she is aware she has the right to medical coverage for 3 years. I told the clmt nothing more will be paid on this claim. She indicated she would "call the State." (kb)
An employer is obligated to furnish all necessary medical expenses related to a work injury and the claimant may recover those expenses reasonably necessary for the treatment of a medical condition caused by a work-related injury. La. R.S. 23:1203. The right to reimbursement for medical expenses is separate and distinct from the right to compensation. Parfait v. Gulf Island Fabrication, Inc., 97-2104, p. 9 (La.App. 1st Cir.1/6/99), 733 So.2d 11,19.
As related in the notes of the claims adjuster for Risk Management Services, Levis Chevrolet's workers' compensation insurer, the reason why further medical benefits were denied to Ms. Sevin was not based on any conclusive medical evidence, but were denied simply because the adjuster had determined that Ms. Sevin had abandoned treatment. The adjuster further refused to recommence payment of medical benefits when Ms. Sevin informed the adjuster that she had resumed medical treatment and requested such payment. The WCJ found that Ms. Sevin was entitled to additional medical benefits related to her workplace injury and ordered that Levis Chevrolet provide future medical treatment that is necessary and pre-approved in the March 14, 2008 judgment appealed herein. Further, the mere failure to return for follow-up appointments is not sufficient justification to terminate or refuse to pay compensation benefits. See Beddes v. Qwik Pantry, 29,657 (La.App.2d Cir.6/18/97), 697 So.2d 695; Reed v. Louisiana Hy-Pro, Inc., 446 So.2d 879 (La. App. 1st Cir.1984).
The failure to authorize a medical procedure for an employee otherwise eligible to receive workers' compensation is deemed to be the failure to furnish compensation benefits, thereby subjecting the employer to an assessment of attorney fees and penalties, unless the claim is reasonably controverted or such nonpayment results from conditions over which the employer had no control. La. R.S. 23:1201; Sims v. BFI Waste Services, L.L.C., 06-1319, p. 11 (La.App. 1st Cir.5/16/07), 964 So.2d 998, 1005. To determine whether a claim has been reasonably controverted, thereby precluding imposition of penalties and attorney's fees, a court must ascertain whether the employer or insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time the employer/insurer refused to pay all or part of the benefits allegedly owed. Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98), 721 So.2d 885, 889.
At trial, Ms. Bates, the adjuster who processed Ms. Sevin's claim, testified that when Ms. Sevin informed her about the two suicide attempts and subsequent hospitalizations in January 2007, Ms. Sevin did not ask for any additional medical assistance, but only requested indemnity benefits. Ms. Bates stated that no healthcare provider had ever contacted her to approve an MRI or further treatment. Ms. Bates said that there was nothing in the records she possessed to indicate that Ms. Sevin needed an MRI, but when asked about the recommendation contained in Ms. Sevin's chiropractic records, which Ms. *890 Bates did possess, she explained that her reason for not approving the MRI at that time was "[pjrobably because she wasn't actively being treated." She also pointed out that Ms. Sevin's chiropractic records only noted that there had been a phone consult with "workers' comp," at which time it was recommended that Ms. Sevin consult with an orthopedist or have an MRI performed. Ms. Bates testified that she did not remember having a conversation with the chiropractor's office, but acknowledged that the conversation was documented in the chiropractor's notes.
Ms. Bates stated that Pelican Urgent Care probably would have recommended that Ms. Sevin consult with an orthopedist or have an MRI performed if Ms. Sevin had returned for further treatment. She acknowledged that Ms. Sevin's file could have been reopened, and that "had someone called for the approval of the MRI if she had gone back in for treatment, it would have been approved." Ms. Bates stated that when Ms. Sevin contacted her in May 2007, she could have reopened Ms. Sevin's file, but following her conversation with Ms. Sevin, she did not see any reason to investigate or reopen Ms. Sevin's claim because she had no one contacting her for approval of medical care.
In light of this evidence, we find that the adjuster was clearly arbitrary and capricious in the handling of Ms. Sevin's claim. When Ms. Sevin contacted Ms. Bates in May 2007, Ms. Sevin was not informed that she needed to have her healthcare providers contact Ms. Bates to have the requested medical treatment approved; nor did Ms. Bates request documentation from Ms. Sevin to determine whether such treatment should be approved. Instead, Ms. Bates simply informed Ms. Sevin that because she had "abandoned" treatment, nothing more would be paid on her claim. Therefore, we find that Ms. Sevin's claim for additional medical benefits was not reasonably controverted and that the actions of the adjuster in handling Ms. Sevin's claim warrant the assessment of penalties and attorney fees pursuant to La. R.S. 23:1201 F. See Authement v. Shapper Engineering, 02-1631 (La.2/25/03), 840 So.2d 1181 ("Thus, we conclude that a failure to authorize treatment can result in the imposition of penalties and attorney fees except when the claim is reasonably controverted. Depending on the circumstances, a failure to authorize treatment is effectively a failure to furnish treatment."); see also Thompson v. The Animal Hospital, 39,154 (La.App.2d Cir.12/15/04), 889 So.2d 1193. Since assessment of the penalty is premised on the adjuster's failure to authorize Dr. Rowland's treatment, we find Ms. Sevin is entitled to the amount of $2,000 as an award of penalties. We further find that the sum of $2,000 is a reasonable amount to award in attorney fees.[8]

CONCLUSION
For the foregoing reasons, we affirm the rulings of the WCJ that Ms. Sevin did not *891 meet her burden of proving she is entitled indemnity benefits for her physical injury or as a result of an alleged mental-physical injury. However, in light of the WCJ's decree in the judgment that Ms. Sevin is entitled to additional medical benefits and our discussion herein, we find that Ms. Sevin is entitled to an award of penalties and attorney fees based on the insurer's act of failing to authorize payment for additional medical treatment as it related to the workplace injury Ms. Sevin on sustained November 1, 2006. Accordingly, we assess the insurer, Risk Management Services, LLC, with $2,000 in penalties and $2,000 in attorney fees, in accordance with La. R.S. 23:1201 F. All costs of this appeal are cast to Risk Management Services, LLC.
RENDERED IN PART AND AFFIRMED.
GAIDRY, J., concurs.
KUHN, J., concurs and assigns reasons.
KUHN, J., concurring.
If in the future, Ms. Sevin's work-related physical injury causes mental injury or exacerbates her pre-existing mental condition, the Office of Workers' Compensation ("OWC") has continuing jurisdiction to consider Ms. Sevin's petition for an amended judgment, subject to the prescriptive limitations established in La. R.S. 23:1209. See La. R.S. 23:1310.8; Falgout v. Dealers Truck Equipment Co., 98-3150, pp. 8-10 (La.10/19/99), 748 So.2d 399. The OWC has jurisdiction to reopen cases as often as necessary to make benefits meet current conditions. Id. at p. 9, 748 So.2d at 406.
NOTES
[1] According to La. R.S. 23:1224, "[n]o compensation shall be paid for the first week after the injury is received; provided, that in cases where disability from injury continues for six weeks or longer after date of the accident, compensation for the first week shall be paid after the first six weeks elapsed."
[2] The actual diagnosis, as stated on the November 2 and November 6 work status reports, simply states "LBP," which we interpret to mean "Lower Back Pain." Ms. Sevin, in her brief on appeal, interprets the letters to mean "Lumbar Back Pain."
[3] Moreover, emails submitted into evidence also show that Ms. Weathers was advised on November 13, 2006, and Ms. Bates on November 15, 2006, of the chiropractor's recommendation regarding Ms. Sevin's work status.
[4] We note that following the November 1, 2006 workplace accident, Ms. Sevin's sole complaint was of back pain, whereas following an automobile accident in October 2003, Ms. Sevin complained of pain in her neck, left shoulder, and back. An MRI report dated December 2, 2003, revealed that Ms. Sevin had a "small central posterior disc protrusion at C6/7." However, prior to seeing Dr. Rowland in April 2007, Ms. Sevin disclosed to another healthcare provider that her ex-husband had grabbed her by the neck and attempted to choke her in January 2007.
[5] The WCJ would not allow Ms. Sevin to introduce an uncertified medical evaluation report from Dr. Rowland, so that evidence was proffered. Ms. Sevin did not assign as error the WCJ's failure to admit the medical evaluation report, so the report is not considered on appeal.
[6] Ms. Sevin's husband was actually her ex-husband, as the couple divorced in 2001, but continued to live together out of financial necessity.
[7] Referring to the 1999, January 4, 2007, and January 11, 2007 suicide attempts.
[8] Louisiana Revised Statutes 23:1201 F provides in part:

Failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim.